UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WARDELL WILLIAMS,

    Plaintiff,

vs.                                                               Case No. 17-11650

HENRY FORD HEALTH SYSTEM,                HON. AVERN COHN

    Defendant.
_____/

## MEMORANDUM AND ORDER
## GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Doc. 12)
## AND DISMISSING CASE

I. Introduction

This is an employment case. Plaintiff Wardell Williams (Williams) is suing his employer Henry Ford Health System (HFHS) claiming reverse sex discrimination, retaliation, and disability discrimination.

Before the Court is HFHF's motion for summary judgment. For the reasons that follow, the motion will be granted.

II. Background

The material facts as gleaned from the record follow.

HFHS is a non-profit healthcare organization which operates several hospitals and medical centers in Southeastern Michigan, including Henry Ford Hospital in Detroit. Williams is employed by HFHS as a Nurse Assistant at Henry Ford Hospital. He has been employed by HFHS since 2005.

Throughout his employment with HFHS, Williams has had documented instances

regarding his behavior, job performance, and attendance. During the period from August 11, 2008, through February 29, 2016, Williams received eight separate corrective action notices. (Corrective Action Materials, Def. Ex. 4.) Several of these were for attendance. Id., at 2-6,8. Others were for misconduct, including behaviors that were "argumentative," "disruptive," "rude," "disrespectful," and "confrontational." Id.at 1.

On May 5, 2015, Williams received a "documented counseling" for attendance and a "written warning" for misconduct on September 21, 2015 (Corrective Action Materials, Def. Ex. 4, at 6-7). Williams filed an appeal under HFHS's Alternative Dispute Resolution Procedure. He received a favorable outcome with respect to the September 21, 2015, written warning. (1/12/16 Hearing Notes, Def. Ex. 5; 1/13/16 Letter, Def. Ex. 6.). The May 5, 2015 attendance warning remained in his file, as did the other warnings and reprimands. (Evans Dep., Def. Ex. 7, at 19.)

In January 2016, Williams' supervisor, Patricia Kosel-Rozanski (Kozel-Razanski) spoke to Williams regarding his job performance. (Kosel-Rozanski Dep., Def. Ex. 9, at 32-33; 1/29/16 Meeting Notes, Def. Ex. 10.). During the meeting, Kosel-Rozanski asked if Williams had "an issue with women because it seem[ed] that he always had issues with women on the unit." (1/29/16 Meeting Notes, Def. Ex. 10; Kosel-Rozanski Dep., Def. Ex. 9, at 33.) Kosel-Rozanski explained at her deposition that she asked this question because Williams was "hard to manage," was "insubordinate" and was "not listening." (Kosel-Rozanski Dep., Def. Ex. 9, at 33.). In an effort to improve Williams' relationships with co-workers, Kosel-Rozanski suggested a "team-building activity." (Kosel-Rozanski Dep., Def. Ex. 9, at 33, 34; 1/29/16 Meeting Notes, Def. Ex. 10.). Williams "agreed;" the remainder of the conversation was "nice." (1/29/16 Meeting

Notes, Def. Ex. 10.).

In February 2016, Williams filed a complaint with the Human Resource (HR) department claiming that he was being harassed by Kosel-Rozanski. (3/28/16 Investigation Report, Def. Ex. 11, at 1.). Williams also said that he was being targeted, constantly accused of not working and subjected to excessive criticism. Id., at 1. The HR department conducted an investigation of the complaint, including 13 witness interviews and a full "departmental assessment." Id. at 2-5.) Based on the investigation, the HR department concluded that Williams had not been "harassed" by Kosel-Rozanski, but she could use coaching on how to deal with difficult employees. (3/28/16 Investigation Report, Def. Ex. 11, at 3, 6; see also 5/9/16 Letter, Def. Ex. 12; Evans Dep., Def. Ex. 7, at 6, 21.). Christine Evans, the HR investigator also recommended that Williams receive coaching or training on accepting and using constructive feedback, and how to communicate so that when responding to others he adheres to team member standards. (3/28/16 Investigation Report, Def. Ex. 11, at 6-7.)

Also in February 2016, several co-workers complained that Williams had become "increasingly difficult to work with" and was lacking in "teamwork and compassion." (Co-worker Complaint Materials, Def. Ex. 8 at 1, 3, 10. Co-workers also reported that he was continuing "to bate people and bully them in a passive aggressive manner." Id., at 9. At this time, Williams was working in the "B-3" unit, which is an orthopedics unit, and was reporting to Kosel-Rozanski. (Williams Dep., Def. Ex. 2, at 20.) The orthopedics unit consisted of both male and female employees, including two male employees that Kosel-Rozanski had hired herself. (Kosel-Rozanski Dep., Def. Ex. 9, at 10-14.) When Kosel-Rozanski attempted to counsel Williams regarding the co-worker

3

complaints, he became "loud and very upset." (Co-worker Complaint Materials, Def. Ex. 8, at 7. Williams also engaged in conduct toward Kosel-Rozanski that she considered to be threatening. Id. at 8.

In May of 2016, Williams requested and was granted a leave of absence due to stress. (6/17/16 Letter, Def. Ex. 13; Williams Dep., Def. Ex. 2, at 75.). While he was on leave of absence, HFHS made arrangements for him to transfer to the MICU unit. (6/17/16 Letter, Def. Ex. 13.). When he returned, Williams said he was "happy to get off B-3." (Williams Dep., Def. Ex. 2, at 75-76.). During his deposition, Williams was asked whether he "wanted to get off of the B-3 unit." Id. at 76. His answer was "Yes. Yes. Yes." Id.

After Williams transferred to the MICU-5 unit, Williams started to have "psychological problems" because his mother was in an intensive care unit at another hospital. (Williams Dep., Def. Ex. 2, at 76-79.) According to Williams, these problems began a "couple of weeks" after he transferred into the MICU. Id. at 79-80.

In order to accommodate Williams, HFHS granted him a leave of absence from July 22, 2016, through September 12, 2016. (7/20/16 Letter, Def. Ex. 14; 8/11/16 Medical Certification, Def. Ex. 15; Williams Dep., Def. Ex. 2, at 82-83.). HFHS also gave Williams time off to care for his mother. (7/13/16 Letter, Def. Ex. 16; Williams Dep., Def. Ex. 2, at 82-83.). After his mother passed away, Williams requested to be transferred to another unit, as it was difficult for him to work in a unit that was similar to the unit where his mother had passed away. (10/10/16 Letter, Def. Ex. 17; 11/8/16 Request for Accommodation, Def. Ex. 18; Williams Dep., Def. Ex. 2, at 84-86.). HFHS reassigned Williams to the Neuroscience 6 West unit, where he is currently working and

enjoys it. (11/11/16 Email, Def. Ex. 19; Williams Dep., Def. Ex. 2, at 11, 86.).

Williams admits that HFHS "accommodated" him by moving him into "the new neuroscience floor, instead of intensive care." (Williams Dep., Def. Ex. 2, at 86.) Williams also stated at his deposition that is getting along smoothly with his current supervisor and coworkers on Neuroscience 6 West. Id. at 132. Williams says he "like[s]" being in the neuroscience unit, and is working with the people who "care about" him. Id. He describes his work environment as being filed with "love." Id.

Despite being happy in his new location, on January 19, 2017, Williams filed a charge with the EEOC alleging that he had requested a "reasonable accommodation" on or about October 10, 2016, and his request "was denied." (1/19/17 EEOC Charge, Def. Ex. 20.) He also said that he had been subjected to "different terms and conditions of employment" based on "disability" and "sex." Id. The EECO eventually issued a right to sue letter. (1/25/17 Notice of Dismissal, Def. Ex. 22.).

In April 2017, Williams filed this case in state court claiming (1) sex discrimination under Michigan's Elliot Larsen Civil Rights Act, (2) retaliation, and (3) disability discrimination under the Americans with Disabilities Act. HFHS removed the case to federal court based on federal question jurisdiction.

### III. Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A moving party may meet that burden "by 'showing'-that is, pointing out to the district court-that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325

5

(1986). Rule 56 provides that:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits, or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support a fact.

Fed. R. Civ. P. 56(c)(1).

The Court must decide "whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law." In re Dollar Corp., 25 F.3d 1320, 1323 (6th Cir. 1994) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)). In so doing, the Court "must view the evidence in the light most favorable to the non-moving party." Employers Ins. of Wausau v. Petroleum Specialties, Inc., 69 F.3d 98, 101 (6th Cir. 1995).

## IV. Analysis

### A. Sex Discrimination

#### 1. Legal Standard

To establish a "prima facie" case of unlawful sex discrimination under Michigan's Elliot Larsen Civil Rights Act (ELCRA) courts apply the familiar McDonnell Douglas test under which a "plaintiff must prove by a preponderance of the evidence that (1) [he] was a member of the protected class; (2) [he] suffered an adverse employment action; (3) [he] was qualified for the position; (4) the circumstances are such as to support an inference of unlawful discrimination. Lytle v. Malady, 458 Mich. 153, 172-73 (1998).

The Michigan Courts have adopted a version of the McDonnell Douglas framework that should be utilized in gender-based reverse discrimination claims. A plaintiff in a reverse discrimination case may establish a prima facie claim of gender discrimination by showing (1) background circumstances supporting the suspicion that the defendant is the unusual employer who discriminates against men; (2) that the plaintiff was qualified for the position; (3) that the plaintiff suffered an adverse employment action; and (4) that a female employee of similar qualifications was treated differently. See Allen v Comprehensive Health Services, 222 Mich. App 426, 433 (1997) (describing a reverse discrimination plaintiff's prima facie claim of gender discrimination in a failure to promote case). See also Neph v. Grimsby, No. 231674, 2002 WL 31958227, at *6 (Mich. Ct. App. Dec. 27, 2002) (describing a reverse discrimination case based on a termination).

To establish an adverse employment action, the plaintiff must show more than a "mere inconvenience or an alteration of job responsibilities." Wilcoxon v. Minnesota Mining & Manufacturing Co., 235 Mich. App. 347 (1999). Plaintiff must show that the disputed employment action was "materially" adverse. Id. Examples include "termination of employment, a demotion evidenced by a decrease in wage or salary, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." Id. at 363-64. The mere fact that an employee is displeased does not, by itself, elevate the act or omission to the level of a materially adverse employment action. Pena v. Ingraham County. Road Com'n, 255 Mich. App. 299, 310-11 (2003).

Once plaintiff has sufficiently established a prima facie case, the burden then shifts to the defendant to articulate a legitimate non-discriminatory reason for plaintiff's

termination.  Lytle v. Malady, 458 Mich. at 172-73.  Once the defendant produces such evidence, even if later refuted or disbelieved the burden of proof shifts back to the plaintiff.  Id. at 174.  At this stage of proof, the plaintiff must then show by a preponderance of admissible direct or circumstantial evidence "that there [is] a triable issue that the defendant's proffered reasons were not true reasons, but were a mere pretext for discrimination"  Id. at 174. It is not enough for plaintiff to "raise a triable issue that the employer's proffered reason was pretextual."  Id. at 175-76.  Instead, plaintiff must show that it was a pretext for sex discrimination.  Id.

## 2.  Application

In support of his claim for sex discrimination, Williams cites his own deposition testimony where he states that "the manager turned the floor against me" and "they was all buddies." (Williams' response Doc. 15 at 4.).  This is a conclusory statement, which does not in any way support a claim for gender discrimination.  Even if Williams was not "buddies" with the people on his floor, this does not mean that his supervisor and co-workers were biased against men.  People working on the floor included both female and male employees, including several male employees who were hired by the same supervisor.  (Joint Statement of Facts, Doc. #18, at ¶ 21.).

When asked to explain the basis for his sex discrimination claim, Williams did not say that he was being treated differently because he is a man. (Williams Dep., Def. Ex. 2, at 106).   Instead, he said that his co-workers were "jealous" of him because he did "good work."

> A They was harassing me. They was harassing me. They were
> jealous because I was doing a good work. I was trying to even
> do stuff beyond my control because they was complaining, and

8

> I didn't want to lose my job. I got a son. I don't want to lose
> my job.
> Q. Why would they be jealous of you?
> A. Because managers was giving me – I mean, people was always
> raving how good I was working them lines.
> Q. Why would anybody care that you were doing a good job?
> A. Because people got hate. It's a hateful world we live in. People
> hate people that try to do the good thing, man. Sorry to say,
> man. People, it's a hateful world when you're trying to do right
> and stand on principles. I don't have a problem if I'm wrong. I
> don't have a problem when I'm wrong.

(Williams Dep., Def. Ex. 2, at 133; see also Kosel-Rozanski Dep., Def. Ex. 9, at 20 (Williams "felt he was being picked on," not because he is a man, but "because he was doing his job").). Williams also testified that a number of his co-workers who he had disagreements with and who complained about him are male. (Williams Dep., Def. Ex. 2, at 60, 61.). This is not evidence of sex discrimination.

Williams also says he was "that he was treated differently than other employees and that he was treated differently due to his gender." (Williams response, Doc. 15, at 4.). However, Williams has not identified the "other employees" to whom he is referring, nor has he explained how they were treated differently.

Williams also says that his manager, Kosel-Rozanski, stated "you should have a male manager." (Williams Dep., Plt. Ex. A, at 106.) Assuming that such comment had been made, that does not indicate Kosel-Rozanski was biased against men. Rather, as Kosel-Rozanski explained, such a comment was made because she believed Williams was biased against women. It is not evidence of sex discrimination.

Moreover, Williams has not suffered an adverse employment action nor any action that were motivated by his gender. While Williams was the subject of corrective action, he did not suffer any loss of salary or benefits because of the corrective action.

9

None of the corrective actions rise to the level of an adverse employment action.

In sum, Williams has not made out a claim for sex discrimination because he has not shown that any action was taken against him because of his sex, or that a similarly situated female was treated more favorably than him. He has also not established the requisite background circumstances which would create a triable issue as to whether HFHS would discriminate against the majority. HFHS is entitled to summary judgment on Williams' claim for sex discrimination.

Further, HFHS says that Williams has not made out a triable claim for sex harassment based on a hostile working environment. The Court agrees. Williams was not subjected to any behaviors that were "physically threatening" or "overtly" discriminatory, nor was he subjected to any behaviors that were frequent, severe, on-going or "extreme." Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993). Co-workers occasionally complained of Williams' "confrontational" behavior and lack of "team work," as did his supervisor, but that does not come close to meeting the definition of a "hostile work environment." Michael v Caterpillar Financial Services Corp., 496 F.3d 584, 600 (6th Cir. 2007)(although employee was placed on a 90-day "performance plan," "shouted at" by her supervisor and subjected to various co-worker "complaints," such conduct did not rise to the level of a hostile work environment"); Morgan v. Triumph Aerostructures, LLC, 296 F. Supp.3d 911 (2017)("workplace spats and personal conflicts" do not rise to the level of a hostile work environment"). Moreover, Williams complained of "harassment," HFHS investigated and took action to address the situation. Thus, even if Williams could establish a hostile work environment because of his sex, he has failed to show HFHS would be liable. See e.g., Morgan, 296 F.Supp.3d

10

911 at ** 10-11(noting that employer had taken "remedial action" to address employee's complaints).

## B. Retaliation

### 1. Legal Standard

Williams also claims that HFHS retaliated against him because of his sex. The ELCRA also prohibits employers from retaliating against employees who complain about sex discrimination. M.C.L. § 37.2701(a) provides that an employer shall not "[r]etaliate or discriminate against a person because the person has opposed a violation of this act, or because the person has made a charge [or] filed a complaint ... under this act." To establish a prima facie case of unlawful retaliation under the ELCRA, plaintiff must show: (1) that she engaged in a protected activity; (2) that defendant knew she engaged in a protected activity; (3) that defendant took an employment action adverse to plaintiff; and (4) that a causal connection existed between plaintiff's protected activity and the adverse employment action. Garg v. Macomb Mental Health, 472 Mich. 263, 273 (2005).

### 2. Application

Williams claims the alleged acts of retaliation consist of: (1) an attendance warning that was issued in February 2016; (2) his transfer from B-3 to MICU-5; and (3) his transfer from MICU-5 to C-6 West. (Williams Dep., Def. Ex. 2, at 116-118, 128-129.). None of these actions were retaliatory. With respect to the attendance warning, Williams does not dispute that he was absent on five days "that are listed." (Corrective Action Materials, Def. Ex. 4, at 8; Williams Dep., Def. Ex. 2, at 70.). The attendance policy expressly states that "4 occurrences in less than

90 days" is grounds for discipline. (Corrective Action Materials, Def. Ex. 4, at 8) While Williams says that two employees, Clinique Pitts and Tracey Campbell received more favorable treatment with respect to attendance, the record does not contain any evidence to support his statement. (Williams Dep., Def. Ex. 2, at 105-107.). As to the transfer from B-3 to MICU-5, it was because Williams requested the transfer.

Williams also says that he was subjected to retaliation because he "won his appeal." (Williams' response Doc. 15 at 5). This argument lacks merit. First, the appeal did not involve a claim for sex discrimination or harassment; Williams only alleged that the corrective action was unfair. Second, the appeal had nothing to do with the co-worker complaints.

Overall, Williams has not put forth evidence to create a triable issue on the claim of retaliation.

### C. ADA

#### 1. Legal Standard

Finally, HFHS says that summary judgment is appropriate on Williams' claim under the ADA. Under the ADA, it is unlawful to "discriminate against a qualified individual on the basis of disability." 42 U.S.C.A. § 12112(a). To make out a claim for disability discrimination, the plaintiff must show that: (1) the plaintiff was an individual with a disability; (2) the plaintiff was otherwise qualified to perform the job requirements with or without reasonable accommodation; and (3) the employer performed an adverse employment action against the plaintiff by reason of plaintiff's disability. To be disabled, the plaintiff must have a physical impairment which substantially limits a major life activity. McKay v. Toyota Motor Mfg., USA, Inc., 110 F.3d 369, 372 (6th Cir., 1997).

Short-term temporary limitations of major life activities do not constitute disabilities under the ADA. Roush v. Weastec, Inc., 96 F.3d 840, 844 (6th Cir., 1996); see also Rosteutcher v. Midmichigan Physicians Group, 332 F. Supp. 2d 1049, 1059 (E.D. Mich. 2004)(depression qualifies as an "impairment" under the ADA, but the plaintiff must still show that his or her depression "substantially limited a major life activity").

For purposes of establishing whether the employer's stated reason was a pretextual, it is relevant to consider whether the stated reason had any base in fact and whether similarly situated employees outside the protected group were treated differently. Rosteutcher, 332 F. Supp. 2d at 1062. Plaintiff must also show that "the employer knew or had reason to know of the plaintiff's disability." Id.

2. Application

Williams was diagnosed on August 11, 2016 as having a "schizoaffective disorder" but the "duration" of the condition was estimated to be only "2-3 months." (8/11/16 Medical Certification, Def. Ex. 15). Williams was also diagnosed on November 2, 2016 as being "unable to work" but only for a twelve month period and only not able to work in the "MICU". (11/2/16 Medical Certification, Williams' Ex. P).

Williams has not made out a claim under the ADA. First, Williams does not have any physical or mental impairment that would rise to the level of a "disability," nor was he subjected to any adverse employment actions or any employment actions based on disability. Williams has not shown that his impairments limit any of his major life activities. He has been able to perform his job duties "at all times" and considers himself to be an "outstanding employee." Williams took time off from work due to stress, but those episodes were temporary, and therefore would not qualify as

13

substantially limiting.

Second, even assuming Williams was disabled under the ADA, the record shows that HFHS accommodated his requests by (1) granting him leave, (2) transferring him to another unit and (3) transferring him again to the neuroscience unit where he currently works without incident. Moreover, there is nothing in the record to show that any action, much less an adverse action, was taken against him because of any of his impairments. There is simply no evidence to support a triable claim under the ADA.

V. Conclusion

For the reasons stated above, HFHS's motion for summary judgment is GRANTED. This case is DISMISSED.

SO ORDERED.

S/Avern Cohn
AVERN COHN
UNITED STATES DISTRICT JUDGE

Dated: 7/24/2018
      Detroit, Michigan